UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JOHN TITTELBACH,
    Plaintiff,

vs.    07-3137

EUGENE McADORY,
    Defendant.

MEMORANDUM OPINION AND ORDER

Before the court are the defendant's summary judgment motion [17] and the plaintiff's response [23].

Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." See Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc.*, 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added).  Personal knowledge may include inferences and opinions drawn from those facts.  *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).  "But the inferences and opinions must be grounded in observation or other first-hand personal experience.  They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience."  *Visser*, 924 F.2d at 659.

## Background

Plaintiff is civilly committed to the custody of the Illinois Department of Human Services ("Department") pursuant to the Sexually Violent Persons Commitment Act, 725 Ill. Comp. Stat. Ann. 207/1 et seq. (West 2008) ("SVP Act"). Plaintiff brings this civil rights action against Eugene McAdory ("McAdory"), a former shift commander, concerning events that occurred at the Rushville Treatment & Detention Facility ("Rushville Facility") on March 12, 2007.  On that date, McAdory ordered Plaintiff, along with several other resident dietary workers, to be placed in handcuff restraints for approximately 10-15 minutes after they had become disruptive in response to staff inquiries related to ongoing food shortage problems at the Rushville Facility. Plaintiff claims that McAdory's actions were arbitrary or excessively punitive and that they constituted battery.

## Undisputed Material Facts

1. Plaintiff is civilly committed to the custody of the Department pursuant to the SVP Act. (Defs.' Ex. B; Tittelbach Dep. Trans. dated Feb. 26, 2009, p. 38, line 23 - p. 39, line 13, attached hereto.)
2. As of March 12, 2007, Plaintiff worked as a dietary cook at the Rushville Facility.  (Defs.' Ex. B; Tittelbach Dep. Trans. dated Feb. 26, 2009, p. 8, line 21 - p. 9, line 10.)
3. McAdory served as shift commander at the Rushville Facility from May 2006 until November 16, 2007. (Defs.' Ex. A; McAdory Aff., ¶ 1, attached hereto.)
4. The Department provides by rules for the nature of the Rushville Facility, the level of care to be provided, and the custody and discipline of persons placed in the Rushville Facility. (Defs.' Ex. A; McAdory Aff., ¶ 2.)
5. The Rushville Facility is the only secure residential facility for persons committed to the custody of the Department for control, care, and treatment pursuant to the SVP Act. (Defs.' Ex. A; McAdory Aff., ¶ 2.)
6. The Rushville Facility provides treatment specially designed for sex offenders in a safe, structured, residential environment. (Defs.' Ex. A; McAdory Aff., ¶ 2.)
7. Treatment and security staff are trained to focus on the needs of each resident, and to treat each resident respectfully, professionally, and with dignity. (Defs.' Ex. A; McAdory Aff., ¶ 2.)
8. On March 12, 2007, McAdory was advised by staff that the dietary unit had run out of french fries at lunch, with residents in two pods and security staff still waiting to be fed. (Defs.' Ex. A; McAdory Aff., ¶ 4.)

9. Food shortages had been an ongoing problem which had persisted for weeks. (Defs.' Ex. A; McAdory Aff., ¶ 4; Defs.' Ex. B; Tittelbach Dep. Trans. dated Feb. 26, 2009, p. 12, line 13 - p. 13, line 21.)
10. Food shortages occurred because, on occasion, the contractual food service vendor, Aramark, did not prepare enough food items. (Defs.' Ex. A; McAdory Aff., ¶ 4.)
11. Food shortages also occasionally occurred because dietary workers stole food for themselves. (Defs.' Ex. A; McAdory Aff., ¶ 4.)
12. Plaintiff acknowledges that resident workers had been accused of stealing food. (Defs.' Ex. B; Tittelbach Dep. Trans. dated Feb. 26, 2009, p. 12, line 13 - p. 13, line 21.)
13. On or about March 11, 2007, the kitchen claimed to have run out of ground beef before everyone was served, and two pans of ground beef (each containing as much as 15 lbs) were found during a search of dietary. (Defs.' Ex. A; McAdory Aff., ¶ 4.)
14. Plaintiff acknowledges that the dietary unit ran out of french fries on March 12, 2007. (Defs.' Ex. B; Tittelbach Dep. Trans. dated Feb. 26, 2009, p. 16, line 10 - p. 18, line 21.)
15. After being advised that the dietary unit had run out of french fries on March 12, 2007, McAdory immediately called a meeting to discuss the ongoing food shortage problems with Aramark staff and resident dietary workers. (Defs.' Ex. A; McAdory Aff., ¶ 5.)
16. The Aramark staff were directed to an office and the resident dietary workers were directed to dining room three because McAdory wanted to discuss the food shortage problems with the respective groups separately. (Defs.' Ex. A; McAdory Aff., ¶ 5.)
17. As the 15 resident dietary workers were directed to a dining room, many of them became loud, aggressive, and generally uncooperative. (Defs.' Ex. A; McAdory Aff., ¶ 6.)
18. The residents refused to sit down, they took defensive postures, and a couple of the residents stated "Fuck this shit" and "This is bullshit[1]." (Defs.' Ex. A; McAdory Aff., ¶ 6; Defs.' Ex. B.)
19. McAdory believed this posed a threat to the safety of staff and to the security of the institution. (Defs.' Ex. A; McAdory Aff., ¶ 7.)
20. The four other staff members present were unarmed and were outnumbered by the residents. (Defs.' Ex. A; McAdory Aff., ¶ 7.)
21. The dining room was near the kitchen where the residents had access to utensils that could be used as weapons. (Defs.' Ex. A; McAdory Aff., ¶ 7.)
22. Consequently, McAdory called additional security staff to the dining room and ordered the residents to be handcuffed and seated, all of which took a matter of minutes. (Defs.' Ex. A; McAdory Aff., ¶ 7.)
23. Security staff applied only the minimal amount of force necessary to apply the cuffs to each resident dietary worker. (Defs.' Ex. A; McAdory Aff., ¶ 8.)
24. Plaintiff does not allege that security staff used unnecessary force when applying the handcuff restraints, nor does he allege that security staff applied the handcuff restraints maliciously. (Defs.' Ex. B; Tittelbach Dep. Trans. dated Feb. 26, 2009, p. 20, line 19 - p. 21, line 7; p. 28, line 20 - p. 29, line 11.)

---

[1]Plaintiff disputes this statement of fact, as well as fact 23, 25, and 31, but does not point to any evidence to support his dispute.

25. After most of the residents calmed down, one of the residents continued to be loud and disruptive, and Security Therapy Aid-IV Haage took that resident to the special management unit for a few minutes and then took him to his room for a two-hour cool down. (Defs.' Ex. A; McAdory Aff., ¶ 9.)
26. After the remaining residents were handcuffed and seated, McAdory talked to the residents about the overall operation of the kitchen and advised them that the stealing and hiding of food would not be tolerated. (Defs.' Ex. A; McAdory Aff., ¶ 10.)
27. After speaking with the residents for a few minutes, McAdory then went to the dietary office and discussed the same issue with the Aramark staff. (Defs.' Ex. A; McAdory Aff., ¶ 11.)
28. A few minutes later, McAdory returned to the dining room and told staff that the cuffs could be removed and that the resident dietary workers could return to work. (Defs.' Ex. A; McAdory Aff., ¶ 11.)
29. At no time did McAdory threaten the safety of the resident dietary workers. (Defs.' Ex. A; McAdory Aff., ¶ 11.)
30. The resident dietary workers were in handcuffs for approximately 10-15 minutes. (Defs.' Ex. A; McAdory Aff., ¶ 12; Defs.' Ex. B; Tittelbach Dep. Trans. dated Feb. 26, 2009, p. 35, line 15 - p. 35, line 24.)
31. At no time did McAdory hear any of the resident dietary workers complain that the handcuff restraints were applied too tightly or that they were injured. (Defs.' Ex. A; McAdory Aff., ¶ 13.)
32. Plaintiff was not disciplined as a consequence of the events of March 12, 2007. (Defs.' Ex. B; Tittelbach Dep. Trans. dated Feb. 26, 2009, p. 33, line 24 - p. 34, line 7.)

Discussion and Conclusion of Law

The court finds that the plaintiff's conditions of confinement were reasonably related to institutional security. Like a pretrial detainee, a civilly committed sexually violent person may not be subjected to conditions that amount to "punishment" without due process. *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008). Sexually violent persons may nevertheless be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not technically be "punished." *Allison v. Snyder*, 332 F.3d 10-1576, 10-1579 (7th Cir. 2003). Facilities dealing with those who have been involuntarily committed for sexual disorders are "volatile" environments whose day-to-day operations cannot be managed from on high. *Youngberg v. Romeo*, 457 U.S. 307, 321-24 (1982) (extending "professional judgment standard to substantive due process claim brought by involuntarily committed mental patient and noting that such a presumption was "necessary to enable institutions of this type–often, unfortunately, overcrowded and understaffed–to continue to function"). Therefore, if professional judgment leads to the conclusion that certain prohibitions are necessary for the well-being of the committed person, then the Constitution permits such prohibitions. *Bell v. Wolfish*, 441 U.S. 520, 539-40 (1979). The U.S. Supreme Court generalizes the proposition this way: "due process requires that the conditions and duration of confinement ... bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young*, 531 U.S. 250, 265 (2001).

No arbitrary exercise of authority

Plaintiff's contention that his placement in handcuff restraints constituted an arbitrary exercise of authority fails to account for the context and setting in which the action was taken. The Rushville Facility is not a prison or jail, but neither is it simply a mental hospital. The SVP Act effectuates the civil commitment of those who have been convicted of a sexually violent offense and who have been found to be "dangerous because [the person] suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f). Measures employed by facility administrators to maintain institutional security, internal order, and ensure the protection of residents and staff are recognized as permissible non-punitive interventions and should only be disturbed when there is evidence of arbitrariness or excessive punitive force. **Youngberg**, 457 U.S. at 322-24 (decisions regarding the conditions of civil confinement are entitled to a presumption of correctness). The determination of whether an official's act is "excessive" must account for the context and setting in which the action occurred; put another way, what might seem excessive or arbitrary in a state mental hospital is not necessarily excessive in a facility dealing with those who have been convicted of a sexual crime and who have been deemed to constitute a danger in the future.

There is no evidence to suggest that Plaintiff was subjected to an arbitrary exercise of authority when McAdory ordered that Plaintiff and other resident dietary workers be temporarily handcuffed. McAdory, as a shift commander, had a legitimate interest in addressing the food shortages which had persisted for weeks because there was reason to suspect that residents had stolen food items. See Ill. Admin. Code tit. 59, § 299.Appendix(A) (resident theft considered a major rule violation). Shortly after the 15 resident dietary workers were directed to a dining room for questioning related to the food shortages, many of the residents became loud, aggressive, and generally uncooperative. (Undisputed Material Fact No. 17.) The residents refused to sit down, took defensive postures, and a couple residents used profanity. (Undisputed Material Fact No. 18.) One resident was taken to the special management unit because he was so loud and disruptive. (Undisputed Material Fact No. 25.) Acting within his discretion, McAdory ordered that residents be handcuffed and seated after he determined that the situation threatened the safety of staff and the security of the institution. (Undisputed Material Facts No. 19-22.) McAdory's decision to order the resident dietary workers handcuffed and seated was a permissible non-punitive intervention that was reasonably related to the maintenance of security within the Rushville Facility.

*De minimis* use of force

The Supreme Court notes that there is no reason to distinguish between convicted inmates and pretrial detainees in the context of excessive force allegations. *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). As a result, the Seventh Circuit has "found it convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) without differentiation." *Board v. Farnham*, 394 F.3d 469, 478 (7 Cir. 2005); *see also Brown v. Budz*, 398 th F.3d 904, 910-15 (there is little practical difference between Eighth Amendment and Fourteenth Amendment standards). The core judicial inquiry in determining whether an official used excessive force in violation of the Eighth Amendment is

5

whether the force was applied in a good-faith effort to maintain or restore discipline rather than to maliciously and sadistically cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6-9 (1992). There are several factors used to determine if excessive force was used, including "the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Filmore v. Page*, 358 F.3d 496, 504 (7 Cir. 2004) (*citing DeWalt v. Carter*, 224 F.3d 607, 619 (7 Cir. th th 1999)). With regard to the extent of injury inflicted, a plaintiff cannot state a claim for excessive force under the Eighth Amendment on a de minimis use of physical force. *Outlaw v. Newkirk*, 259 F.3d 833, 838 (7th Cir. 2001). De minimis uses of physical force are excluded from constitutional recognition if the use of force ". . . is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10-15. Here, there is no evidence for a rational jury to find that McAdory acted maliciously and sadistically to cause Plaintiff harm when he ordered that the resident dietary workers be handcuffed. Plaintiff does not allege that security staff applied the handcuff restraints maliciously or in a manner that caused him physical harm. (Undisputed Material Fact No. 24.) Plaintiff and the other resident dietary workers were in handcuffs for approximately 10-15 minutes only. (Undisputed Material Fact No. 30.) The incident described by Plaintiff is just the type of a de minimis use of force that does not implicate the Eighth Amendment. Furthermore, it is clear from statements made in the Plaintiff's response to the Defendants' Undiputed Statement of Facts that he simply believes that the residents should not have been handcuffed at all and he finds it offensive. That is not enough. Accordingly, McAdory is entitled to summary judgment as to the claim that he used force maliciously and sadistically to cause Plaintiff harm.

Qualified immunity

The doctrine of qualified immunity shields government officials from liability for civil damages on account of their performance of discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court required to rule upon qualified immunity of a government official must first determine whether a favorable view of the plaintiff's alleged facts show that the official's conduct violated a constitutional right, and, if they have, to determine whether the applicable constitutional standards were clearly established at the time the events took place. *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir. 1996). The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted. *Saucier*, 533 U.S. at 202. This inquiry must be "undertaken in light of the specific context of the case, not as a broad general proposition" and must be "particularized" based on the facts confronting the officer. *Brosseau v. Haugen*, 543 U.S. 194 (2004); *Anderson v. Creighton*, 483 U.S. 635 (1987). Government officials may be protected from liability for objectively reasonable decisions, even if the decision is later determined to be wrong. *Jones*, 856 F.2d at 994.

Implicit in the qualified immunity analysis is the requirement that the violation must have been intentional or the result of some gross misfeasance or nonfeasance on the part of the governmental officer arising to the level of incompetence. *Anderson*, 483 U.S. 635. To the extent that the temporary restraint of residents in response to a perceived threat to the safety

of staff and to the security of the institution represents an arbitrary exercise of authority, a ruling against McAdory would represent an announcement of new law. In *Hyatt v. McAdory*, No. 07-3135 (C.D. Ill., filed May 30, 2007), this court considered an identical claim brought by a resident dietary worker who was subjected to handcuff restraints on March 12, 2007. In granting McAdory's summary judgment motion, this court stated:

> It is not this court's province, nor the jury's role, to second-guess Defendant McAdory's order that the residents be handcuffed and seated in the dining room for 15 minutes while McAdory spoke to them about the food shortages. The deference afforded McAdory under the Constitution under any standard allowed him to make that call. The court understands that Plaintiff does not believe handcuffs were necessary at all. Plaintiff does not dispute, however, that the residents were loud, rowdy, uncooperative, and upset at what they believed were unjust accusations. One resident had to be taken out because he would not calm down. McAdory acted within his discretion when he determined that the situation might get out of control, threatening the safety of staff and the residents. His response to the perceived threat was reasonable and, in the court's view, de minimis, given that the entire incident lasted only 15 minutes. In short, McAdory did not violate the Constitution by directing that the residents be handcuffed.

Hyatt, No. 07-3135 (C.D. Ill. Mar. 6, 2009) (order granting summary judgment) (Defs.' Ex. C; Hyatt Summ. J. Order.) Because the law did not put McAdory on notice that his conduct was clearly unlawful, he is entitled to qualified immunity.

Injunctive relief

Even when a constitutional violation is found, the power of federal courts to issue injunctive relief is circumscribed by the nature and extent of the constitutional violation. *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991). A federal court does not have jurisdiction to grant injunctive relief in the absence of an ongoing violation of federal law. *Id*. This lawsuit pertains solely to events alleged to have occurred on March 12, 2007. (Ct. Doc. #1.) Because Plaintiff fails to articulate an ongoing violation of law and the courts finds that McAdory did not violate the Plaintiff's constitutional rights in this incident, McAdory is entitled to summary judgment in his favor as to Plaintiff's claim for injunctive relief.

McAdory Did Not Commit The Offense Of Battery

Illinois courts define battery as "the unauthorized touching of another person." *Luss v. Village of Forest Park*, 377 Ill. App. 3d 318, 878 N.E.2d 1193, 1206 (Ill. App. Ct. 2007). "To be liable for battery, the defendant must have done some affirmative act intended to cause an unpermitted contact." *Walls v. Lombard Police Officers*, 2002 WL 548675, *6 (N.D. Ill. 2002) (citing Glowacki v. Moldtronics, Inc., 264 Ill. App. 3d 19, 636 N.E.2d 1138, 1140 (Ill. App. Ct. 1994). Although correctional officers may touch inmates for the purpose of maintaining security

and custody, that "privilege exists only to the extent the means employed are not in excess of those which they reasonably believe are necessary." *Smith v. Mangrum*, 1996 WL 607001, *9 (N.D. Ill. 1996). Similarly, civilly committed individuals may be subjected to conditions designed to prevent their escape and maintain security. *Allison*, 332 F.3d at 10-1579; *see also Thielman v. Leean*, 282 F.3d 478, 485 (7th Cir. 2002) (use of handcuffs, waist belt, and leg chains when transporting civilly committed individuals are not "atypical" and "significant" hardships in relation to confinement). The U.S. Supreme Court has held that police executing a search warrant on a house may reasonably detain the occupant in handcuffs while the search is in progress because governmental interests outweigh the "marginal intrusion." *See Muehler v. Mena*, 544 U.S. 93, 99 (2005) (two-three hour detention of private citizens in handcuffs during search was reasonable). Certainly, if police can handcuff a private citizen for several hours during a search without offending the Constitution, then security officials at the Rushville Facility must be accorded the same deference in their treatment of involuntarily committed sex offenders. Thus, the use of handcuff restraints on Plaintiff and the other resident dietary workers for only 10-15 minutes in response to McAdory's perceived threat did not outweigh legitimate security interests and was reasonable.

It is ordered:

1. Pursuant to Fed. R. Civ. Pro. Rule 56, the defendant's summary judgment motion is granted [17]. The clerk of the court is directed to enter judgment in favor of the defendant and against the plaintiff and to terminate this lawsuits in its entirety.
2. If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455 appellate filing fee irrespective of the outcome of the appeal.

Enter this 24th    day of February 2010.

**s\Harold A. Baker**

_____
Harold A. Baker
United States District Judge